IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Time 2 Shine BMX LLC, | ) | Civil Action No. 2:25-cv-08265-DCN |
| | ) | |
| Plaintiff, | ) | **VERIFIED COMPLAINT** |
| | ) | |
| v. | ) | |
| | ) | |
| Matthew McEvoy and | ) | |
| Strada Group, LLC | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |

COMES NOW Plaintiff Time 2 Shine BMX LLC, complaining against Defendants Matthew McEvoy and Strada Group, LLC, as follows:

**INTRODUCTION**

1. This case involves a fraudulent sale of a business by Mr. McEvoy, and one of his entities, Strada Group, LLC. Upon investigation, it was recently discovered that McEvoy had filed for bankruptcy prior to the sale, which was notably his third bankruptcy case filed within 8 years. Review of McEvoy's most recent bankruptcy petition, attached hereto as **Exhibit A**, has exposed that he had represented under oath and penalty of perjury to the federal bankruptcy court, that all of his assets combined, including his ownership interests in the business at issue, were worth less than $50,000. The federal bankruptcy court relied on his sworn representations and approved his bankruptcy plan. McEvoy turned around and marketed the business with a broker for sale for $800,000 and ultimately sold it to Plaintiff for $600,000. In so doing, McEvoy did not disclose his immediately preceding, inconsistent bankruptcy filings, and made numerous false representations and warranties to Plaintiff about the business. After wiring the purchase money, Plaintiff learned that the business is in shambles, and indeed, essentially worthless, as McEvoy

1

had affirmed to the federal bankruptcy court. When recently confronted by Plaintiff's private investigator, McEvoy said he was unwilling to return the purchase money and reacted by immediately filing a motion to dismiss his own bankruptcy case, long after he had already benefited from the court approving his bankruptcy plan, citing "his own personal reasons," without amending or otherwise addressing his prior sworn representations, and recognizing that "the fact of filing will not be erased from the court's records." The bankruptcy court entered an order dismissing that case earlier today. Wherefore, respectfully, Plaintiff brings this action in law and equity to rescind the contract and unwind the transaction carried out under that certain Asset Purchase Agreement, attached hereto as **Exhibit B**, and recover or impose a constructive trust over its purchase money, a sum-certain in the amount of $600,000, among other relief, detailed herein.

## PARTIES AND JURISDICTION

2. Plaintiff Time 2 Shine BMX LLC is a single member South Carolina limited liability company, owned by a single member holding company, owned by a resident of Charleston, South Carolina, whose name is Mark Shadek. Mr. Shadek formed the entity for the purpose of purchasing and operating the business at issue from Charleston, South Carolina.

3. Defendant Matthew McEvoy is a resident of Philadelphia, Pennsylvania.

4. Defendant Strada Group, LLC is a New Jersey limited liability company, owned by McEvoy, for which McEvoy is the registered agent.

5. This Court has personal jurisdiction, and venue is proper in this Court, by agreement of the parties, pursuant to Sections 9.5 and 9.6 of the Asset Purchase Agreement, attached hereto as **Exhibit B**.

6.  This Court has subject matter jurisdiction based upon diversity of citizenship because the parties reside in different states and the matter in controversy exceeds the value of $75,000, exclusive of interest and costs, pursuant to the provisions of 28 U.S.C. §§ 1332.

## FACTUAL BACKGROUND

7.  The business at issue in this case is known as and hereinafter referred to as the "Time 2 Shine Business."  McEvoy started and owned and operated the business for more than a decade, upon information and belief.  It focuses on marketing and selling BMX bikes and parts, primarily through a website and e-commerce platform, www.time2shineBMX.com, excerpted in part as follows:



8.  On March 22, 2024 (unbeknownst to Plaintiff), McEvoy filed that certain Voluntary Petition for Individuals Filing for Bankruptcy with the United States Bankruptcy Court in the

Eastern District of Pennsylvania, Case No. 24-10977-AMC, attached hereto as **Exhibit A**. Therein, McEvoy represented that his combined assets were "worth" "$0 - $50,000"; he made multiple references to the Time 2 Shine Business that he owned and disclosed his limited income therefrom, without making any mention of Strada Group, LLC; and he signed the petition under penalty of perjury, excerpted in pertinent parts, without limitation, as follows:

> 19. **How much do you estimate your assets to be worth?**
> - ☑ $0-$50,000
> - ☐ $50,001-$100,000
> - ☐ $100,001-$500,000
> - ☐ $500,001-$1 million
>
> . . .
>
> **Employment status**
> - ☑ Employed
> - ☐ Not employed
>
> **Occupation** owner
>
> **Employer's name** TIME 2 SHINE BICYCLE SHOP
>
> **Employer's address**
> Number  Street
>
> ,
> City    State    ZIP Code
>
> **How long employed there?** 13 years
>
> . . .
>
> 12. **Are you a sole proprietor of any full- or part-time business?**
> A sole proprietorship is a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC.
> If you have more than one sole proprietorship, use a separate sheet and attach it to this petition.
> - ☐ No. Go to Part 4.
> - ☑ Yes. Name and location of business
>
> Time 2 Shine Bicycle Pro Shop
> Name of business, if any
>
> 200 Grove Rd
> Number  Street
>
> Suite H
>
> Paulsboro                NJ     08066
> City                     State  ZIP Code

4

. . .

19. **Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**
    ☐ No
    ☑ Yes. Give specific information about them...........

    | Name of entity: | % of ownership: | |
    |---|---|---|
    | T2S Hobbies, LLC | 100 % | $ 15,000.00 |

. . .

35. **Any financial assets you did not already list**
    ☑ No
    ☐ Yes. Give specific information...

. . .

44. **Any business-related property you did not already list**
    ☑ No
    ☐ Yes. Give specific information ...........

. . .

**Part 8: List the Totals of Each Part of this Form**

| | | | |
|---|---|---|---|
| 55. Part 1: Total real estate, line 2 ................................................................►| | | $0.00 |
| 56. Part 2: Total vehicles, line 5 | $ 0.00 | | |
| 57. Part 3: Total personal and household items, line 15 | $ 8,800.00 | | |
| 58. Part 4: Total financial assets, line 36 | $ 17,300.00 | | |
| 59. Part 5: Total business-related property, line 45 | $ 1,700.00 | | |
| 60. Part 6: Total farm- and fishing-related property, line 52 | $ 0.00 | | |
| 61. Part 7: Total other property not listed, line 54 | + $ 1,800.00 | | |
| 62. Total personal property. Add lines 56 through 61 .................... | $ 29,600.00 | Copy personal property total► | + $ 29,600.00 |
| 63. Total of all property on Schedule A/B. Add line 55 + line 62 | | | $ 29,600.00 |

. . .

2. **List monthly gross wages, salary, and commissions** (before all payroll deductions). If not paid monthly, calculate what the monthly wage would be.  2. $ 2,500.00

3. **Estimate and list monthly overtime pay.**  3. + $ 0.00

4. **Calculate gross income.** Add line 2 + line 3.  4. $ 2,500.00

. . .

5

| For last calendar year: | ☐ Wages, commissions, bonuses, tips $ 48,000.00 |
|---|---|
| (January 1 to December 31, 2023) | ☑ Operating a business |

| For the calendar year before that: | ☑ Wages, commissions, bonuses, tips $ 0.00 |
|---|---|
| (January 1 to December 31, 2022) | ☑ Operating a business |

. . .

I have examined this petition, and I declare under penalty of perjury that the information provided is true and correct.

If I have chosen to file under Chapter 7, I am aware that I may proceed, if eligible, under Chapter 7, 11,12, or 13 of title 11, United States Code. I understand the relief available under each chapter, and I choose to proceed under Chapter 7.

If no attorney represents me and I did not pay or agree to pay someone who is not an attorney to help me fill out this document, I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I understand making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

✗ /s/ Matthew McEvoy
Signature of Debtor 1
Executed on 03/22/2024
MM / DD / YYYY

✗ _____
Signature of Debtor 2
Executed on _____
MM / DD / YYYY

9. McEvoy's two prior bankruptcies occurred in 2016 and 2022, Case Nos. 16-00350 and 22-00188.

10. On November 8, 2024, Plaintiff received an "Offering Memorandum" from a broker, WebsiteClosers.com, engaged by McEvoy to sell the Time 2 Shine Business, attached hereto as **Exhibit C**. Therein, McEvoy was personally identified as the "Business Owners / Shareholders," the business and its financials were favorably described and promoted, and the "Asking Price" was "$800,000," based upon represented "Sales" of "$984,922," "Earnings" of $263,415," and a "Multiplier" of "3.04x," excerpted in pertinent parts, without limitation, as follows:

6

**INTRODUCTION**

Time2Shine is an SBA Pre-Qualified eCommerce Brand that truly shines bright in the BMX market. They are a 13-year-old business that has made themselves into a staple of the BMX community, with several hard-to-acquire accounts for BMX parts and mountain bike brands that give them an edge over competitors. As they have more of a focus on mountain bikes than other companies, they have a unique position in the market that the right buyer can draw attention to.

. . .

**List the Business Owners / Shareholders**
- MATTHEW MCEVOY

. . .

**Are you the original owner? If not, how long have you owned it?**
- Yes I am the original owner. Since 2011.

**Age of Business**
- 13 years

. . .

**FINANCIAL SNAPSHOT**

| | |
|---|---|
| Asking Price | $800,000 |
| Sales | $984,922 |
| Earnings | $263,415 |
| Multiplier | 3.04x |

    11.    On November 10, 2024, McEvoy and Mr. Shadek entered into that certain "Letter of Intent (LOI) for Time 2 Shine," attached hereto as **Exhibit D**.

12.     On December 17, 2024 (again, unbeknownst to Plaintiff), McEvoy's bankruptcy plan was approved by order of the federal bankruptcy court, attached hereto as **Exhibit E**.

13.     On April 17, 2025, McEvoy and Strada Group, LLC entered into that certain "Asset Purchase Agreement" with Plaintiff, attached hereto as **Exhibit B**. Therein, McEvoy signed twice, both as an individual and as the managing member of Strada Group, LLC, which McEvoy represented and warranted owned the Time 2 Shine Business; he fraudulently induced Plaintiff to agree to a purchase price of $600,000 and complete a wire transfer; he falsely represented and warranted, *inter alia*, that there was no pending litigation or court orders relating to the Time 2 Shine Business, that the favorable financials and other materials provided were true, correct, and complete, that all e-mail accounts, business records, and other business assets would be promptly and fully transferred, that the business had theretofore been operated lawfully and that customers and suppliers were satisfied; and he further induced Plaintiff to enter the agreement by providing personal indemnification for all representations, warranties, obligations, and actions of Strada Group, LLC, excerpted in pertinent parts, without limitation, as follows:

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (this "Agreement") is made and entered into as of April 17, 2025 (the "Effective Date"), by and between Time 2 Shine BMX LLC, a South Carolina limited liability company ("Buyer"), and Strada Group, LLC, a New Jersey limited liability company ("Seller").

**WHEREAS**, Buyer desires to purchase, and Seller desires to sell, the Assets used in connection with the Business (as defined herein).

. . .

(e)     "Business" shall mean that certain ecommerce business under the name and doing business as "Time2Shine BMX" or "Time2Shine", which is conducted through certain channels or websites including, without limitation, time2shinebmx.com and/or any other name pursuant to which Seller conducts such business.

. . .

(c) "Assets" shall mean all assets as owned, operated, leased, licensed, used, corresponding to and/or entered into by Seller and/or used in connection with the Business, including, without limitation: (i) Seller's rights under all contracts and agreements (including, without limitation, rights to all vendor rebates, rates and discounts, and shipping rates and discounts); (ii) all trademarks, trade secrets, copyrights, patents, artwork, logos, software programs, databases, source code, email servers and data, know-how, email accounts, technologies and other intellectual property rights, whether registered or not; (iii) all domain names, websites, accounts (including, without limitation, all seller accounts and marketplace accounts on Amazon.com, eBay.com, Walmart.com and other similar marketplaces and their respective Affiliates), email lists, customer lists, vendor lists, contracts for purchases from suppliers or deliveries to customers of Seller and/or the Business, past research reports, studies and content produced; (iv) all website traffic, analytics software and accounts, graphics, content, databases, forms, internal search engines, advertising on or relating to the websites, data, programming code, user and customer lists, consumer data and all other information and property as it pertains to the websites of the Business and/or the operation thereof, including, but not limited to, all social media accounts, including, but not limited to, Instagram, Facebook, Twitter, Pinterest, Google Plus, YouTube, Myspace, comparison shopping accounts, Google AdWords accounts, Google Merchant Center accounts, Webmaster Tools accounts, Google Analytics accounts, Bing AdCenter accounts, and any other similar accounts, services or websites used in connection with any of the Business (and all users, fans and/or followers thereof), blogs, email accounts, servers, host accounts, applications, software and platforms used by the Business' websites and/or its blog(s), and any other accounts, tools, extensions, application programming interfaces (APIs), electronic data interchanges (EDIs) or third party relationships or software used by Seller to operate, or that has been collected or used during the operation of, the Business; (v) all machinery, furniture, fixtures, equipment, tools, dies, molds or any other equipment of any kind used in connection with the Business, including, without limitation, etching machines, computers, monitors, wiring, racking, tables, packaging and shipping materials; (vi) all inventory (including, without limitation, the Inventory (as defined herein)) and those tangible assets listed on Schedule 1.1(c); (vii) all Authorizations; (viii) all Business Records; (ix) all of Seller's rights to receive, assert rights with respect to or otherwise benefit from

any and all warranties, guaranties or other assurances made by third parties in connection with the Business; (x) all prepaid items relating to the Business, including, without limitation, all deposits and prepaid items; (xi) all goodwill associated with or arising out of the Business, (xii) all Receivables arising on or after the Closing Date, and (xiii) all other assets and Proprietary Rights.

. . .

(f) "Business Records" shall mean all business and marketing records, including accounting and operating records, asset ledgers, reports, budgets, customer lists, vendor and supplier lists, customer support requests and complaints, ledgers, copies of agreements or arrangements, information or data relating to all leased or owned equipment, files, correspondence, mailing lists, advertising/promotional materials and brochures and other business records of Seller used in or otherwise relating to the Assets, in whatever form they exist.

. . .

2.1 Purchase and Sale of the Assets. Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller will sell, convey, transfer and assign to Buyer, and Buyer will purchase and acquire, free and clear of all Liens and Liabilities, all of Seller's right, title and interest in and to each of the Assets and the Business.

. . .

3.2 Payment of the Purchase Price; Allocations. Buyer will deliver, or cause to be delivered, the Purchase Price as follows:

(a) $600,000 to Seller and/or its designee on the Closing Date, via wire transfer of immediately available funds and pursuant to a closing statement executed by the parties; and

(b) Up to $75,000 in the form of a promissory note on the Closing Date (the "Note").

(c) Buyer and Seller agree that the Purchase Price shall be allocated as follows: $50,000 to intellectual property, $25,000 to the Non-Compete (as defined herein), and $600,000 to goodwill.

. . .

5.9 <u>Litigation</u>. There is no action, suit, claim, investigation, subpoena or proceeding of any nature pending or, to the Knowledge of Seller, threatened against Seller or that relate to the Business or the Assets, nor, to Seller's Knowledge, is there any basis for any such action, suit, claim or proceeding. There is no judgment, order, writ, settlement agreement, injunction and decree of any Governmental Entity to which Seller is a party or by which it is bound or which relate to the Business or the Assets.

. . .

3.3 <u>Further Assurances; Post-Closing Cooperation</u>.

(a) At any time or from time to time after the Closing, at either party's request, without further consideration, the other party shall execute and deliver to such party such other instruments of sale, transfer, conveyance, assignment and confirmation and provide such other reasonable assistance and cooperation as may be reasonably requested by such party in order more effectively to transfer, convey and assign to Buyer all of the Assets and to put Buyer in actual possession and operating control of the Assets. Such assistance and cooperation shall include, but is not limited to, transfer of all website domains, website hosting agreements, database access passwords and procedures, administrative login information, software and software as a service (SaaS) access passwords and procedures, logins and accounts for marketplaces and email marketing platforms, full access to all other electronic assets being acquired, transfer of Proprietary Rights and introductions to customers, users, vendors, industry experts and other individuals and entities related to the conduct of the Business.

. . .

5.6 <u>Title to Assets; Encumbrances; Data Security</u>.

. . .

(b) Seller owns and has good and marketable title to the Assets, free and clear of all Liens.

(c) The Assets include all of the assets, property and rights, whether tangible or intangible, that are currently used for the conduct of the Business and are sufficient for Buyer to conduct the Business immediately after the Closing in substantially the same manner as conducted by Seller prior to the Closing.

. . .

5.4 <u>Restrictions on Transaction</u>. There is no agreement, commitment, judgment, injunction, order or decree to which Seller is a party or that is binding upon the Assets which has or may have the effect of

prohibiting the consummation of the transactions contemplated by this Agreement or impairing Buyer's use or ownership of the Assets after the Closing.

5.5 <u>Financial Statements; Warranties</u>.

(a) Seller has provided Buyer with copies of financial statements of Seller and the Business (collectively, the "<u>Financial Statements</u>"). The Financial Statements properly reflect all Assets and Liabilities as are (or were) then in existence, and the results of operations of Seller and the Business for the periods presented, and are complete and accurate in all material respects. The Financial Statements have been prepared on an income tax basis of accounting. Seller has no indebtedness. Seller has no Liabilities required to be disclosed on Seller's balance sheets except for Liabilities reflected or reserved against in the Financial Statements and current liabilities incurred in the ordinary course of business of Seller since the date of the most recent Financial Statements. There have been no material changes in the operation or financial condition of the Business since the latest Financial Statements provided to Buyer.

. . .

(b) (i) No customer listed on Schedule 5.13 (A) has stopped or decreased the rate of, (B) to Seller's Knowledge, has threatened to stop or decrease the rate of, or (C) to Seller's Knowledge, as a result of the transactions contemplated by this Agreement, is reasonably likely to stop or decrease the rate of, purchasing materials, products or services from the Business, and (ii) no supplier listed in Schedule 5.13 (A) has stopped or decreased the rate of, (B) to Seller's Knowledge, has threatened to stop or decrease the rate of, (C) to Seller's Knowledge, will increase its prices or rates of goods or services in connection with, or (D) to Seller's Knowledge, as a result of the transactions contemplated by this Agreement, is reasonably likely to stop or decrease the rate of, supplying materials, products or services to the Business.

. . .

5.11    Compliance with Laws. Seller has complied with, is in compliance with, is not in violation of, and has not received any written notices of such Seller's violation of, any Applicable Laws with respect to any of Seller's ownership of the Assets and operation of the Business. Seller does not have, and is not required to have, for the operation of the Business as it is presently conducted, any permits, licenses or other authorizations required pursuant to any Applicable Law. Seller has not received any written notice, report or other information regarding any actual or alleged material violation of Applicable Law, or any Liabilities or potential liabilities (whether accrued, absolute, contingent, unliquidated or otherwise), including any investigatory, remedial or corrective obligations, arising under any Applicable Law. To Seller's Knowledge, there are no violations or irregularities with respect to, nor are there any reasonable grounds to anticipate the commencement of any investigation or inquiry concerning or relating to the Assets or the Business.

. . .

5.14    Completeness of Disclosure. Seller has fully provided Buyer with all the information that Buyer has requested for deciding whether to purchase the Assets and all information that Seller believes is reasonably necessary to enable Buyer to make such decision. No representation or warranty made by Seller in this Agreement, and no statement made by Seller in Schedules, taken as a whole, contains any untrue statement of a material fact or omits to state a material fact required to be stated herein or therein or necessary to make any statement herein or therein, in light of the circumstances in which it was made, not misleading.

. . .

8.1    Indemnification by Seller. Each of Seller and Owner (collectively for purposes of this Article 8, the "Seller Indemnitors") shall, jointly and severally, indemnify, defend and hold Buyer and its shareholders, members, managers, officers, employees, agents and Affiliates (collectively, the "Buyer Indemnified Parties"), harmless against all claims, losses, liabilities, damages, deficiencies, diminution in value, lost profits, penalties, Taxes, judgements, awards, costs and expenses, including reasonable legal, consulting, accounting and other professional fees and expenses of investigation and defense (hereinafter individually a "Loss" and collectively "Losses"), paid, sustained or incurred by any Buyer Indemnified Party, or any of them, directly or indirectly, relating to, or arising out of, (a) any breach or inaccuracy of any representation or warranty of Seller contained in this Agreement or any document, certificate or instrument delivered in connection herewith, (b) any failure by Seller or any of the Restricted Parties to perform or comply with any covenant contained in this Agreement or any document, certificate or instrument delivered in connection herewith, (c) all Liabilities, and all other liabilities and obligations of any kind whatsoever, including Taxes, whether accrued, absolute, contingent, known or unknown, relating to, or arising out of, the conduct of the Business or ownership or use of the Assets prior to the Closing Date, (d) with respect to any and all payment obligations to any broker or finder engaged by Seller and/or its Affiliates. or with respect to any claim by any person arising out of or relating to ownership of an interest in or to the equity interests of Seller, and (e) fraud, intentional misrepresentation or willful misconduct by Seller.

. . .

**SELLER:**

STRADA GROUP, LLC,
a New Jersey limited liability company

By: _____
Matt McEvoy, Managing Member

The undersigned hereby acknowledge and agree to be bound by the applicable provisions of this Agreement:

_____
Matt McEvoy

14. In connection with the closing, McEvoy provided wiring instructions, requesting the purchase money to be wired to a bank account with Citizens Bank in the name of Strada Group, LLC ending in 5244, and in part, to McEvoy's broker, WebsiteClosers.com, to which McEvoy owed a broker's fee.

15. On April 17, 2025, the transaction was closed, and the purchase money was wired, on April 18, 2025, per McEvoy's instructions, as reflected in the following redacted excerpt from the wire transaction records:



| Disbursements | | |
|---|---|---|
| 04/18/2025 | OUTGOING MONEY TRANSFER Strada Group LLC | $544,125.00 |
| 04/18/2025 | OUTGOING MONEY TRANSFER Website Closers Time2 Shine | $55,875.00 |

16. In the weeks and months after the closing, as Plaintiff began operating the Time 2 Shine Business, McEvoy refused to provide access to and transfer e-mail accounts and other business records and assets that he sold, as the Asset Purchase Agreement required (concealing the full extent of his fraud, to be discovered in this litigation). Nonetheless, as disgruntled customers and suppliers began communicating with Plaintiff as the new owner of the business, it was uncovered that McEvoy had been regularly scamming customers by not stocking, procuring,

or otherwise delivering products ordered and not providing promised refunds for the same (skewing all purported financials), that the website did not function properly as an e-commerce platform for fulfillable purchase orders and needs to be redeveloped (at great cost), and that McEvoy had misrepresented the nature and good standing of his relationships with suppliers. In sum, the business was in shambles, and had little, if any, value at the date of the sale. The following e-mail, for example, of which there are many more, reflect McEvoy's troubled operation of the business prior to the sale:



17.     Finally, upon further investigation leading to this legal action, Plaintiff discovered the above-described bankruptcy filings, revealing that McEvoy admitted under oath and penalty of perjury that the Time 2 Shine Business he sold to Plaintiff for $600,000 was, in fact, essentially worthless.

18.     On July 11, 2025, a Friday, Plaintiff's private investigator, Frank Worrell (CPA, Certified in Financial Forensics, FBI Special Agent – Retired), went to McEvoy's residence in Philadelphia and asked him about his bankruptcy filings and the sale of the business.

19.     Obviously reacting to being confronted, on July 14, 2025, the following Monday, McEvoy filed a motion to dismiss his own bankruptcy case in which the bankruptcy plan benefiting him had already been approved by order of the court and in place since 2024, citing "his own

personal reasons," without further explanation, making no attempt to amend or otherwise address his prior sworn representations, and recognizing that "the fact of filing will not be erased from the court's records," attached hereto as **Exhibit F**, excerpted in pertinent part as follows:

> 4. Counsel has been advised of the consequences of his dismissal including but not limited to the fact that he will not receive a discharge, that the fact of filing will not be erased from the court's records, that any accrued interest may be charged, and that he could be sued for any outstanding obligations to creditors. Counsel has also explained that any orders of this court in his favor will be vacated by the dismissal.
> 5. Counsel received an email from the debtor stating that he understood the consequences of his decision, but wished the case to be dismissed for his own personal reasons.
> 6. Counsel believes that the debtor has made a knowing and intelligent decision.
> 7. The debtor, therefore, moves the court for an order of voluntary dismissal under 11 U.S.C. §1307(b).

20. On July 22, 2025, Plaintiff's investigator, Mr. Worrell, called McEvoy, asked him if he would unwind the sale of the business and return the purchase money, to which McEvoy said no, and McEvoy then informed Mr. Worrell that he had filed the above document in his bankruptcy case following their meeting in Philadelphia.

21. On July 23, 2025, earlier today, the bankruptcy court entered an order dismissing that case, attached as **Exhibit G**.

22. Plaintiff promptly filed this action together with a motion for a temporary restraining order, on July 23, 2025.

23. Upon information and belief, it is likely that McEvoy will attempt to deplete or transfer Plaintiff's purchase money, in view of McEvoy's clearly shown fraudulent acts, admitted insolvency, repeated bankruptcies, and reaction of belatedly filing a motion to dismiss his own bankruptcy case immediately after being initially confronted.

**CAUSES OF ACTION**

## COUNT I

### (FRAUD)

24. The preceding paragraphs are realleged.

25. As further detailed above in the Factual Background, McEvoy, personally and as the managing member of Strada Group, LLC, made representations pertaining to the Time 2 Shine Business in the Offering Memorandum, related due diligence materials, and the Asset Purchase Agreement (including about litigation and court orders, valuation, ownership, solvency, financials, customers, and suppliers); which were false and material; as McEvoy knew or recklessly disregarded, in view of his own inconsistent bankruptcy filings, admitting that the business was his and was essentially worthless and that he was insolvent; with the intent that Plaintiff act upon the representations and send a wire for $600,000 for the essentially worthless business backed by warranties and indemnification from a repeated, habitual bankrupt that were likewise essentially worthless; while Plaintiff did not know about the bankruptcy filings and other concealed information, including in the e-mail accounts and other business records that McEvoy refused to transfer as required; and Plaintiff was entitled to rely the Offering Memorandum and the Asset Purchase Agreement; and damages proximately resulted from Plaintiff's reliance on McEvoy's said false representations, including but not limited to the loss of Plaintiff's purchase money, $600,000, in addition to closing costs and other expenses.

## COUNT II

### (NEGLIGENT MISREPRESENTATION)

26. The preceding paragraphs are realleged.

27. As further detailed above in the Factual Background, McEvoy, personally and as the managing member of Strada Group, LLC, made representations pertaining to the Time 2 Shine

Business in the Offering Memorandum, related due diligence materials, and the Asset Purchase Agreement (including about litigation and court orders, valuation, ownership, solvency, financials, customers, and suppliers); which were false and material in view of his own inconsistent bankruptcy filings, admitting that the business was his and was essentially worthless and that he was insolvent; he owed had a pecuniary interest in making such statements to induce Plaintiff to purchase the business from him; he owed a duty of care, by contract and law, to communicate truthful information; he breached that duty by failing to exercise due care; Plaintiff justifiably relied upon the representations and wired $600,000 for the essentially worthless business backed by warranties and indemnification from a repeated, habitual bankrupt that were likewise essentially worthless; while Plaintiff did not know about the bankruptcy filings and other concealed information, including in the e-mail accounts and other business records that McEvoy refused to transfer as required; and Plaintiff was entitled to rely the Offering Memorandum and the Asset Purchase Agreement; and damages proximately resulted from Plaintiff's reliance on McEvoy's said false representations, including but not limited to the loss of Plaintiff's purchase money, $600,000, in addition to closing costs and other expenses

## COUNT III

### (BREACH OF CONTRACT)

28.     The preceding paragraphs are realleged.

29.     As detailed above in the Factual Background, a contract existed, the Asset Purchase Agreement, and McEvoy and Strada Group, LLC were both parties thereto; they breached the express provisions of that contract, by making representations and warranties that were not true (including about litigation and court orders, valuation, ownership, solvency, financials, customers, and suppliers) and not transferring e-mail accounts and other assets purportedly sold; causing

16

damages to Plaintiff in the amount of the purchase price, $600,000, in addition to closing costs and other expenses.

## COUNT IV

### (CONSTRUCTIVE TRUST)

30. The preceding paragraphs are realleged.

31. As detailed above in the Factual Background and Counts I, II, and III, through fraud and misrepresentations and breaching a contract, and in view of McEvoy's sworn statements in bankruptcy court, McEvoy and his entity, Strada Group, LLC, obtained $600,000 of purchase money wired by Plaintiff for a business that was essentially worthless, which purchase money does not equitably belong to them and has unjustly enriched them, and which they cannot in good conscience retain or withhold from Plaintiff, giving rise to the equitable remedy of a constructive trust over the same.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

i. judgment on its claims;

ii. recovery of its purchase money under the Asset Purchase Agreement, a sum-certain in the amount of $600,000;

iii. the equitable recission of the Asset Purchase Agreement and unwinding of the transaction;

iv. a temporary restraining order (TRO) and then preliminary injunction, preventing McEvoy and Strada Group, LLC from depleting or transferring Plaintiff's purchase money and freezing the bank account with Citizens Bank in the name of Strada Group, LLC ending in 5244, and any other bank accounts or assets held by or for

      McEvoy, Strada Group, LLC, or any other entity owned or controlled by McEvoy, to which Plaintiff's purchase money or the transfer or conversion thereof may be traced or attached, so as to preserve the status quo and ability to recover or impose a constructive trust upon Plaintiff's purchase money or any conversion thereof in the sum certain amount of $600,000;

v.    the equitable imposition of a constructive trust over Plaintiff's purchase money of $600,000;

vi.   other actual, compensatory, consequential, and punitive damages, to be determined at trial;

vii.  attorney's fees and costs;

viii. pre and post judgment interest; and

ix.  any other relief that the Court deems just, equitable, and proper.

 

                                    *s/ Jason S. Smith*
                                    Jason S. Smith, Esq. (11387)
                                    HELLMAN & YATES, PA
                                    105 Broad Street, Third Floor
                                    Charleston, SC  29401
                                    (843) 414-9755 (phone)
                                    (843) 266-9188 (facsimile)
                                    js@hellmanyates.com

                                    *Attorney for Plaintiff*

Charleston, South Carolina
July 23, 2025

## VERIFICATION OF COMPLAINT

PERSONALLY APPEARED before me, Mark Shadek, who being duly sworn, deposes and says: that he is the sole beneficial owner and person authorized to act for the Plaintiff, Time 2 Shine BMX LLC, in the foregoing action, that he has read the within Verified Complaint, and that the facts are true of his own knowledge, except those matters and things therein alleged upon information and belief, and as to those, he believes them to be true.

*Mark Lawrence Shadek*
Mark Shadek

SWORN to and subscribed before me this  23rd  day of  July , 2025

*Wilda Metayer*
Wilda Metayer
NOTARY PUBLIC FOR   State of Florida  County of  Broward
My Commission Expires:  11/13/2028

WILDA METAYER
Notary Public - State of Florida
Commission # HH 612034
Expires on November 13, 2028

☐ is personally known to me or ☑ produced a DRIVER LICENSE as identification
Notarized remotely online using communication technology via Proof.

19